U.S. DISTRICT COURT
EASTERN DISTRICT
2015 OCT 27 P 12: 29

JON W. SANFILIPPO
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                    Case No. 15-CR-

DEACONESS HOME HEALTH, INC.,

Defendant.

15-CR-207

---

## PLEA AGREEMENT

---

1.      The United States of America, by its attorneys, James L. Santelle, United States

Attorney for the Eastern District of Wisconsin, and William J. Lipscomb, Assistant United States

Attorney, and the defendant, Deaconess Home Health, Inc., individually and by attorney Patrick

S. Coffey, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the

following plea agreement:

## CHARGES

2.      The defendant has been charged in a one-count information which alleges a

violation of Title 18, United States Code, Sections 1347 and 2.

3.      The defendant, by its duly authorized representative, has read and fully

understands the charge contained in the information. The representative fully understands the

nature and elements of the crime with which the corporation has been charged.  In addition, the

terms and conditions of the plea agreement have been fully explained to the defendant's

representative by its attorney.

4.     The defendant, by its duly authorized representative, voluntarily agrees to waive prosecution by indictment in open court.

5.     The defendant, by its duly authorized representative, voluntarily agrees to plead guilty to the information which is attached hereto as Attachment A and incorporated herein.

6.     The defendant, by its duly authorized representative, acknowledges, understands, and agrees that the defendant is, in fact, guilty of the offense described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts set forth in Attachment B beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish its guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## PENALTIES

7.     The parties understand and agree that the offense to which the defendant will enter a guilty plea carries a maximum fine of $500,000 under Title 18, United States Code, Section 3571(c)(3), a term of probation of not less than one year nor more than five years under Title 18, United States Code, Section 3561(c)(1), and a mandatory special assessment of $400 pursuant to Title 18, United States Code, Section 3013(a)(2)(B).  The parties understand that the Court may also order restitution.

8.     The defendant acknowledges, understands, and agrees that it has discussed the relevant statutes as well as the applicable sentencing guidelines with its attorney.

## ELEMENTS

9.     The parties understand and agree that in order to sustain the charge of executing a health care fraud scheme as set forth in the Information, the government must prove each of the following propositions beyond a reasonable doubt:

2

<u>First,</u> that there was a scheme to defraud a health care benefit program, and
<u>Second,</u> that the defendant knowingly and willfully executed the scheme.

## **SENTENCING PROVISIONS**

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 5. The defendant, by its duly authorized representative, acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

3

## Sentencing Guidelines Calculations

14.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

## Base Offense Level

16.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in the Information is six under Sentencing Guidelines Manual § 2B1.1(a)(2).

## Specific Offense Characteristics

17.     The parties agree to recommend to the sentencing court that a 18-level increase for loss over $2,500,000 under Sentencing Guidelines Manual § 2B1.1(b)(1)(J) is applicable to the offense level for the offense charged in the Information.

4

18.     The parties further agree to recommend to the sentencing court that a 2-level increase under Sentencing Guidelines Manual § 2B1.1(b)(7) is applicable to the offense level for the offense charged in the Information because the federal health care offense involved a government health care program and the loss is more than $1,000,000.

## Acceptance of Responsibility

19.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of its intention to enter a plea of guilty.

## Sentencing Recommendations

20.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

22.     The parties agree to recommend that a 2 year term of probation be imposed.  The parties also agree to recommend that no fine be imposed due to the restitution to be paid as described below.

5

## Court's Determinations at Sentencing

23.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above.  The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction, subject to the terms of the related civil settlement entered into in EDWI cases 10-C-253, 11-C-973, and 13-C-488.  The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

26.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, upon request of the FLU during any period of probation imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

## Fine

27.     The parties agree to recommend to the sentencing court that no fine be imposed against the defendant because of restitution and ancillary civil penalty obligations.

6

## Restitution

28.      The parties agree that restitution and civil penalties under the False Claims Act, 31 U.S.C. Section 3729, et seq., shall be paid under the terms of a civil settlement to be entered into contemporaneously with this agreement. The parties further agree that the amount of approximately $2,206,398.02 seized from Layton State Bank Account ending in 0520 shall be retained by the United States as an offset to the agreed restitution and civil settlement amount.

## Special Assessment

29.      The defendant agrees to pay the special assessment in the amount of $400 prior to or at the time of sentencing.

## DEFENDANT'S WAIVER OF RIGHTS

30.      In entering this agreement, the defendant acknowledges and understands that it surrenders any claims it may have raised in any pretrial motion, as well as certain rights which include the following:

    a.    If the defendant persisted in a plea of not guilty to the charges against it, it would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.    If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and its attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

7

d.  At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

31.  The defendant, by its duly authorized representative, acknowledges and understands that by pleading guilty it is waiving all the rights set forth above. The defendant further acknowledges the fact that its attorney has explained these rights to its representative and the consequences of its waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant's representative under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the representative's answers may later be used against the defendant in a prosecution for perjury or false statement.

32.  The defendant, by its duly authorized representative, knowingly and voluntarily waives all claims it may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

33.  Defendant agrees to fully cooperate with the government in its continuing investigation and to provide access to documents within the control of the defendant.

### Further Civil or Administrative Action

34.  The defendant, by its duly authorized representative, acknowledges, understands, and agrees that it's representative has discussed with it's attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority

8

of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies except as provided above.

## GENERAL MATTERS

35.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

36.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

37.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

38.     The defendant, by its duly authorized representative, understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## Further Action by Internal Revenue Service

39.     Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax,

9

interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charges alleged in the information.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

40. The defendant, by its duly authorized representative, acknowledges and understands if the defendant violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing.

## VOLUNTARINESS OF DEFENDANT'S PLEA

41. The defendant, by its duly authorized representative, acknowledges, understands, and agrees that the defendant will plead guilty freely and voluntarily because the defendant is in fact guilty. The defendant, by its duly authorized representative, further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

10

**ACKNOWLEDGMENTS**

I am the representative of the defendant and am duly authorized to enter into this agreement on behalf of the defendant. The defendant is entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. The attorney for the defendant has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with the defendant's attorney and I am satisfied that my attorney has provided effective assistance of counsel.

DEACONESS HOME HEALTH, INC.

Date: 10/22/15

LAZARUS BONILLA
Owner and President of Deaconess

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant's representative. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 10/22/15

PATRICK S. COFFEY
Attorney for Defendant

For the United States of America:

Date: 10/23/15

GREGORY HAANSTAD
Acting United States Attorney

Date: 10/22/15

WILLIAM J. LIPSCOMB
Assistant United States Attorney

11

**Attachment A to Deferred Prosecution Agreement in *United States v. Bonilla*, 15CR____.**

THE UNITED STATES ATTORNEY CHARGES:

1.     Beginning by January of 2010, and continuing until April 18, 2013, in the State and Eastern District of Wisconsin, and elsewhere,

**DEACONESS HOME HEALTH, INC. and
LAZARUS BONILLA**

in connection with the delivery of and payment for health care benefits and services, knowingly and willfully devised and executed a scheme to defraud a health care benefit program and to obtain money from a health care benefit program by means of material false and fraudulent pretenses, representations and promises (hereinafter the "scheme"), which is more fully described below.

The Defendants

2.     Deaconess Home Health, Inc. ("Deaconess") was a Wisconsin corporation with its primary business operations located in the Eastern District of Wisconsin.   Deaconess provided home health care services, which included both skilled nursing care and unskilled care provided by personal care workers ("PCWs").   Deaconess formerly was known as Outreach Home Health. Deaconess had offices in Milwaukee, Wisconsin, and primarily conducted business and executed the scheme in the Milwaukee area.

3.     Lazarus Bonilla was the president and sole owner of Deaconess and Outreach at all times material to this Information. Lazarus Bonilla actively participated in the operation of both Outreach and Deaconess.

The Medicaid Program

4.     The Medicaid Program is a health care benefit program established by federal law to pay for medical services provided to indigent and other qualified individuals.   The Medicaid

5

Program is funded jointly by the federal government and individual states and administered by each individual state. The federal government oversees and funds the Medicaid Program through the U.S. Department of Health and Human Services ("HHS") and its Centers for Medicare and Medicaid Services ("CMS"), which was formerly known as the Health Care Financing Administration.

5. Under the Medicaid Program, entities that provide health care services to Medicaid recipients submit claims for payment directly to state Medicaid agencies or indirectly through state authorized intermediaries. Health care providers can only submit claims to Medicaid for services that are actually provided and which are medically necessary. By submitting a claim for payment, a health care provider certifies that the care was medically necessary and provided in accordance with Medicaid regulations.

6. Under the Medicaid Program, Deaconess was required to receive a "prior authorization" from the Wisconsin Medicaid program or from a Wisconsin authorized Medicaid HMO before providing more than 50 hours per year of personal care services to a Medicaid member. A prior authorization defines and limits the assistance a patient needs and the services for which a provider may seek reimbursement. The prior authorization is designed, in part, to prevent the provision of and reimbursement for unnecessary and inappropriate care and services.

7. In order to obtain a prior authorization, Deaconess was required to complete an assessment form known as the "Personal Care Screening Tool" ("PCST"). The PCST was to be completed by a registered nurse based on a face-to-face evaluation of the patient in the patient's home. After directly observing the patient performing activities of daily living, the nurse was to note all functional deficits and determine the level of care needed.

6

8.    The assessments recorded in the PCST were then used to create a "plan of care." The plan of care detailed the frequency and anticipated duration of service and the type of service to be provided.   The plan of care had to be approved by a signature of a physician.

9.    To ensure that the personal care services continued to be appropriate and medically necessary, the Medicaid Program also required providers like Deaconess to have a registered nurse conduct a supervisory visit every 60 days.   During a supervisory visit, a registered nurse was required to review the plan of care, evaluate the patient's current functionality, and directly observe the PCW providing the care required by the plan of care.

<u>The Scheme</u>

10.    The defendants' scheme to defraud the Medicaid Program and to obtain money owned by the Medicaid program entailed the following:

a.    In order to increase billings to and reimbursements from the Medicaid program, the defendants intentionally recruited both patients and PCWs without regard to the medical needs of the patients and the integrity and legitimacy of the billings the PCWs submitted to Deaconess and that Deaconess ultimately submitted to the Medicaid program for reimbursement. The defendants knew that the patients served by the Medicaid program were from low income homes. The defendants also knew that patients and personal care workers were typically members of the same family. Deaconess actively recruited patients by promising that the patient's family members could be paid for providing care to those who were Medicaid members. Deaconess recruited care workers by offering payment for providing care to family members who were Medicaid eligible.   Deaconess' recruitment of patients and personal care workers was undertaken with no consideration for the true medical needs of Medicaid members.   At the same time, Deaconess had no compliance program in place to prevent fraud and to insure that all

7

services provided were medically necessary and delivered in accordance with the plan of care approved by a physician.

b.  The defendants intentionally directed nurses to assess the needs of new and continuing patients on the patient's worst imaginable day, in contravention of the Medicaid regulations and program requirements. The defendants also instructed nurses to routinely inflate, without regard to medical necessity, Deaconess' assessment of patient needs, both as to the level and frequency of care, on the PCST. The defendants directed staff to increase the level of care and frequency of care on the PCST above the assessments made by the nurses in the field. The routine inflation, or "up-coding," of the nursing assessments and PCSTs led directly to prior authorizations to provide and bill for services that were significantly in excess of what was medically necessary.

c.  The defendants also intentionally set out to limit the scope and frequency of supervisory visits in contravention of the Medicaid program requirements. For significant periods of time, Deaconess' nursing staff, under direct instruction from the defendants, did not complete supervisory visits every 60 days as required. As defendants knew, Deaconess nursing staff never completed supervisory visits for some patients for significant periods of time for which Deaconess billed the Medicaid program. In the midst of rapidly increasing numbers of patients and PCWs, the defendants failed to establish a system that would have ensured that timely supervisory visits were completed with the PCW present so that provision of care could be assessed. Deaconess' field nurses routinely failed to properly assess the provision of care to patients as the Medicaid regulations required. The defendants also failed to allow for sufficient time for field nurses to complete supervisory visits. The lack of sufficient time to complete the supervisory visit encouraged field nurses to take shortcuts in their evaluations, particularly as to functionality.

8

Field nurses routinely failed to document their observations of improved functionality of their patients. Deaconess' management practices resulted in Deaconess' field nurses routine failure to complete supervisory visits in accordance with Medicaid regulations. Because Deaconess did not complete supervisory visits in the manner and in the time frame required, Deaconess had no way of verifying that the care for which it billed for was actually being provided and was being provided in a medically appropriate fashion.

        d.      The defendants were aware that the primary care physicians for many of Deaconess' patients refused to sign the plans of care that were necessary for Deaconess to receive prior authorizations to bill for Medicaid services. In part to address this problem, the defendants hired physicians as "medical directors." The defendants instructed the medical directors to sign plans of care for patients who did not have a primary care physician and for patients whose primary care physicians refused to sign and authorize care. Deaconess' utilization of medical directors led directly to medical directors signing plans of care that were not supported by a proper assessment of patient needs by a nurse or a physician.

        e.      The defendants failed to implement a compliance program to prevent and detect fraud among patients and their PCWs and otherwise failed to train its employees to prevent, detect, and eliminate fraudulent billings. As a direct result, the defendants knew that PCWs working for Deaconess billed Deaconess for hours that they did not work and for services that they did not provide. In turn, Deaconess billed the Medicaid program for work and services that had not been performed and provided.

        11.      As a direct result of the defendants' scheme, the defendants knew that Deaconess was submitting claims for payment to the Medicaid Program that were false and fraudulent. The defendants knowing and willfully submitted claims for payment from the Medicaid Program that

9

they knew were fraudulent.   Defendants received reimbursements from the Medicaid Program for fraudulent claims totaling more than $5 million.

All in violation of Title 18, United States Code, Sections 1347 and 2.

Lazarus Bonilla was the owner and operator of Deaconess Home Health, Inc. ("Deaconess"). Deaconess was a Wisconsin corporation that, among other things, provided home health care services to Medicaid eligible patients. Deaconess was known as Outreach Home Health prior to mid-2012. Mr. Bonilla participated in the management of Outreach and Deaconess between 2004 and April 18, 2015. Mr. Bonilla actively managed Deaconess between the summer of 2010 and the fall of 2011, a period in which Mr. Bonilla was the chief executive officer. Between early 2010 and April 18, 2013, Lazarus Bonilla drew compensation from Outreach/Deaconess of more than $2 million.

Deaconess's primary business was to serve as a conduit for billing the State of Wisconsin and managed care agencies for personal care services that were provided to Medicaid eligible patients by personal care workers ("PCWs"). Deaconess PCWs worked as independent contractors for Deaconess, and were paid to assist patients with tasks of daily living, including bathing, grooming, dressing, toileting, light cleaning and meal preparation. The Medicaid program funds used to reimburse Deaconess for the work performed and billed by Deaconess PCWs were funds owned in part by the United States through the Department of Health and Human Services.

Deaconess received approximately $16 from the Medicaid program for every hour of care that a PCW provided. Deaconess paid the PCW approximately $8 for every hour billed. Deaconess had a financial incentive to maximize its profits by having a large pool of Medicaid patients for which Deaconess could bill. Deaconess also had a financial incentive to increase the hours per patient per day that PCWs billed. PCWs, who often were family members of the Medicaid patients Deaconess served, likewise had a financial incentive to increase the number of hours of care so as to increase their household incomes.

Marketing:

In order to increase the number of patients for whom it could bill for personal care services, in 2012 Deaconess engaged in a marketing campaign that primarily targeted potential PCWs. Deaconess had billboards that announced that potential PCWs could "Get Paid" to care for family members at home. Deaconess ran television advertisements with a similar message. Deaconess additionally paid individuals for bringing in new patients and for obtaining signed plans of care. Individuals were paid as much as $75 for new patient referrals and were also paid up to $150 for signed plans of care. By marketing to individuals who had a financial incentive to care for eligible Medicaid patients, rather than obtaining patients primarily from referrals made by primary care physicians, Deaconess's officers, owners, and managers knew that there existed a substantial risk that medically unnecessary services would be requested by PCWs and allied patients. Deaconess had no compliance program in place to prevent fraud and to insure that all services provided were medically necessary and effectively delivered under a plan of care approved by a treating physician. Mr. Bonilla knew of the marketing campaign, the potential

11

financial motivation of the patient's families, and the lack of a compliance program designed to detect and prevent fraud.

<u>Assessments of new and continuing patients:</u>

Deaconess further increased the likelihood of billing for medically unnecessary services by the way in which it assessed new and continuing patients. After obtaining new referrals through advertising to potential PCWs and other means – rather than through a treating physician -- Deaconess scheduled a visit by a registered nurse to complete a nursing assessment of the patient's functionality in the patient's home. Deaconess' officers and managers trained and instructed registered nurses to complete the nursing assessment in a manner that inflated the patient's need for services significantly in excess of medical necessity.

Deaconess' officers and managers trained the registered nurses who went out into the field to perform assessments of patient's functionality to assess based on the patient's potentially "worst day," rather than on how the patients functioned at the time of the assessment. The imagined "worst day" was developed from questioning the patient, whose family member PCW would have a financial interest in increased hours resulting from inflated assessments of need, rather than from the nurses' actual observations. The Medicaid regulations required that each patient be assessed on functionality on a typical day, based on the nurses' actual observations. Bonilla knew of the training and instruction provided to the field nurses regarding nursing assessments.

Deaconess field nurses documented their assessment of patients using a form called the Personal Care Screening Tool ("PCST"). Because the nurses assessed patients on an imaginary "worst day," the functionality documented on the PCSTs did not reflect the true need of each patient. The needs of patients were inflated or "up-coded." The PCSTs were then uploaded by Deaconess' employees into a State of Wisconsin web portal that calculated the number of hours that were necessary to care for the patient per day. The hours provided by the web portal were then used to develop a plan of care ("POC") for each patient. The POC was sent to the patient's physician for approval (if the patient had a treating or primary care physician). Deaconess used the signed POC as substantiating documentation when it submitted a request for authorization for services to Medicaid managed care agencies or directly to the State of Wisconsin.

Witnesses who had been employed at Deaconess reported to law enforcement that after a registered nurse completed a PCST, Deaconess' officers and managers directed office staff to change the answers on the PCSTs to inflate the number of hours it could bill Medicaid. A former office clerk told HHS investigators that her supervisor told her to "play around" with the web portal to increase the amount of hours it would authorize Deaconess to bill per patient. The former clerk also recalled the owner of Deaconess telling her that she should "try to get as much as you can" when entering the results of the PCST into the web portal. Another former employee, who was also employed to input the results of the PCST into the state's web portal told investigators that the owner of Deaconess told her that less than two hours of service per day was unacceptable and that if the web portal calculated that a patient needed less than two hours

per day of service, she was to "fix it" so the number of hours increased to at least two hours per day. This employee told investigators that she felt pressured by Deaconess' officers and managers to "say whatever I needed to (during entry of the PCST data) to get the hours up." The State of Wisconsin collects the data that home health agencies input into its web portal; that data corroborated the witness statements that Deaconess would change the assessment of patients so as to increase the amount of hours awarded. The data showed multiple submissions of PCSTs for the same patient on the same day, oftentimes resulting in a very large increase in services allowed for each patient. Bonilla was aware of the changes made to PCSTs and did nothing to halt the practice.

Another former employee of Deaconess, told investigators that in 2012 patients were often reassessed for continuing service for significantly more hours than had previously been allowed; the approved hours for many of the reassessed patients went from 2 hours per day to 6 hours per day without proof of a change in condition. Deaconess business records show that in 2012 the company significantly increased the hours per patient per day it billed even as it dramatically increased the number of patients it served. In February 2012, Deaconess averaged approximately 2 hours per patient per day; by November 2012, it was 3.15 hours per patient, per day. In executive committee minutes, Deaconess' management noted that while Deaconess achieved 3.15 hours per patient per day, the state average was only 1 to 2 hours.

A PowerPoint presentation used by Deaconess to train nurses in January 2013 instructed nurses on how to complete the PCST. The PowerPoint included a slide that showed how the average hours per patient per day rose steadily from July to December 2012, with a big "Thank you!" at the top of the slide. A former clinical supervisor, told investigators that nurses who reported to her expressed fear of submitting reassessments resulting in reduced hours. Another nurse told investigators that the COO at Deaconess became furious when there was a reduction in billable hours resulting from her assessments. Bonilla was aware of management's focus on increasing billable hours per patient per day and its communication of this focus to managers and staff.

Supervisory Visits:

To insure that the PCWs were actually providing the care required in the POC and the insure that the care provided was effective, the Medicaid program required home health agencies to have a nurse conduct a "supervisory visit" every 60 days. The regulations required that the supervising nurse observe the PCW in the home providing the care outlined in the POC. A nurse conducting a supervisory visit was required by review the requirements for service in the POC and to observe and document the PCW providing the required service. A nurse also was required to assess whether the patient's condition had improved and whether the POC remained appropriate. If the patient had improved and the authorized amount of care was no longer medically necessary, the agency was required to submit a new PCST consistent with that assessment. Mr. Bonilla was aware of the requirements of the Medicaid regulations regarding supervisory visits.

13

Witness who had been employed at told law enforcement investigators that Deaconess did not comply with the regulations governing supervisory visits. Witnesses told investigators that in May 2010, the owner of Deaconess advised nurses and office staff that supervisory visits had to be done only once a year, despite being advised by state regulators and program manuals that the state regulations required visits every 60 days. The owner of Deaconess told his staff that under his interpretation of the governing regulations only yearly recertification visits were required. Thereafter, and for a significant period of time, the field nurses did not conduct supervisory visits every 60 days. When Deaconess did resume conducting supervisory visits every 60 days, the supervisory visits often were conducted without the PCW present. A field nurse employed by Deaconess from 2011 to 2013 told investigators that both the COO of Deaconess and the owner of Deaconess told her that PCWs did not need to be present for a supervisory visit. Accordingly, the nurses did not observe the PCWs providing the care required in the plan of care. Former clinical supervisors at Deaconess also recounted that scheduling supervisory visits with the PCW present was not feasible given the volume of patients. Mr. Bonilla knew of the lack of required supervisory visits and knew that the supervisory visits were conducted without the PCW being present.

The failure to conduct timely supervisory visits in accordance with the Medicaid regulations resulted in Deaconess falsely certifying that care was provided in accordance with the regulations. The State of Wisconsin conducted an audit in 2008 and again in 2011. It concluded in 2008 that it overpaid Deaconess/Outreach $150,000 due to a lack of supervisory visits. In 2011, the state found that it overpaid Deaconess $1.4 million due to supervisory visits not being conducted as required. The results of the audits were presented to Deaconess' officers and to Mr. Bonilla.

Obtaining Physician Signatures on Plans of Care:

A by-product of the referrals coming from advertising to potential PCWs and from individuals who recruited patients for Deaconess, rather than from primary care physicians, was difficulty and delays in obtaining a physician's signature on POCs. Signed plans of care were necessary for obtaining authorization for billing. In 2011, Deaconess hired medical directors who were paid a salary of $2000 a month. The medical directors signed off on POCs. Deaconess used its medical directors to sign plans of care knowing that the physician signing the plan of care had not conducted a full examination of the patient and was not sufficiently familiar with the patient's medical and physical needs. Mr. Bonilla was aware of the practice and knew that the practice increased the risk that Deaconess was billing the Medicaid program for care that was not medically necessary.

Billings for Medically Unnecessary Care

The policies and practices of management officials at Deaconess led to Deaconess submitting claims for reimbursement for care that was not medically necessary. The policies

14

and procedures employed by management officials led directly to Deaconess submitting claims for reimbursement for care that Deaconess could not verify as having been provided and that was not always actually provided. Field nurses interviewed by HHS investigators told investigators that as many as two-thirds of patients at Deaconess did not need the care that Deaconess billed to the Medicaid program.

Emails from company officers referenced complaints from physicians about their patients receiving PCW services for services that were not needed. Emails between corporate officers show that management was made aware of PCWs billing for hours when they were in jail or when the patients were in the hospital. Emails show that a management official encouraged an employee to try to get more hours (4 hours per day instead of 1) for a patient whose doctor questioned why she was getting personal care services at all but was still willing to sign off on a POC.

Deaconess' managers noted at executive committee meetings that PCWs were completing their time sheets in the Deaconess lobby and were not careful about reporting actual hours worked and actual times worked. Executive committee meetings minutes show that management officials knew that one PCW, who also was the most productive individual obtaining new patient referrals for Deaconess for pay, was billing for 17 to 20 hours per day, 7 days a week.

The proliferation of patient cases with inflated hours for care that was not provided and not medically necessary resulted directly from the conduct of Deaconess' managers as described above. Deaconess' aggressive efforts to increase the number of patients receiving care and to insure that the agency billed as many hours as could be approved for reimbursement for its patients without regard to medical necessity, resulted in its reimbursements from Medicaid to rise substantially while Mr. Bonilla was actively engaged in running the company. In 2008, Deaconess received direct Medicaid reimbursements of approximately $3.2 million. In 2011, Deaconess received direct Medicaid reimbursements of over $6.2 million dollars. In 2012, Deaconess received direct Medicaid reimbursements of over $14 million. These figures do not include reimbursements from managed care agencies under the Medicaid program. Mr. Bonilla knew of the increase in billings to and reimbursements from the Medicaid program. Mr. Bonilla also knew that the company could not certify compliance with the Medicaid program regulations for the claims for reimbursements it submitted. Mr. Bonilla knew that because of the practices of Deaconess there existed a substantial risk that a portion of the billings Deaconess submitted to the Medicaid program were misrepresented or false.

15